FILED

MAY - 3 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

PHILIP P. KALODNER
208 Righters Mill Road
Gladwyne, PA 19035

    Plaintiff

       V.

                          CIVIL ACTION NO.

SAMUEL BODMAN
Secretary of Energy, United States
1000 Independence Ave. S.W.
Washington DC 20585

GEORGE B. BREZNAY
Director, Office of Hearings and Appeals
U.S. Department of Energy
1000 Independence Avenue S.W.
Washington DC 20585

AND

PUBLIC SERVICE ELECTRIC & GAS CO.
80 Park Plaza
Newark, NJ 07102-4109

EASTMAN CHEMICAL COMPANY
100 N. Eastman Road
Kingsport, TN 37660-5265

GENERAL MOTORS CORPORATION
2000 Renaissance Center Box 300
Detroit, MI 48265-3000

SEAGROUP, INC.
2187 Atlantic St.
Stamford, CT 06902-6880

CASE NUMBER  1:06CV00818

JUDGE: Rosemary M. Collyer

DECK TYPE: Administrative Agency Revi

DATE STAMP: 05/03/2006


CLASS ACTION

GENERAL COUNCIL ON FINANCE AND
ADMINISTRATION OF THE UNITED
METHODIST CHURCH
1200 Davis Street
Evanston, IL 60201-4193

CITY OF NEW YORK
100 Church St.
New York, NY 10007

ZIM ISRAEL NAVIGATION CO. LTD
5801 Lakewright Drive
Norfolk, VA 23502-1862

     Defendants

---

## COMPLAINT

### A. NATURE OF ACTION, JURISDICTION AND VENUE

1. This is an action for a common fund fee sought by
plaintiff, an attorney, from funds which have been (i) allocated
by the U.S. Department of Energy ("DOE") to each of more than
27,000 claimants in the DOE crude oil refund proceedings, and
(ii) 90% of which funds allocated to each claimant have been
disbursed to each such claimant, with (iii) the remaining 10%
allocated to each such claimant withheld by the DOE for possible
payment to plaintiff Philip P. Kalodner ("Kalodner") as a common
fund fee.

In Count I of the Complaint, as to which the defendants are
the Secretary of Energy and the Director of the Office of
Hearings and Appeals, plaintiff seeks as a common fund fee to be
paid him the 10% withheld by the DOE in the disbursement to each

claimant to whom disbursement (of 90%) has been made. In Count II of the Complaint, as to which the defendants are claimants who have received a 90% distribution and who are sued as representatives of all claimants who have received distribution of the 90% (other than those claimants with whom plaintiff as fee agreements), plaintiff seeks, in the alternative to recovery from the DOE, recovery of the same 10% fee from the claimants to whom disbursement of 90% has been made and to whom an additional 10% has been allocated.

The basis of the request for a common fund fee is that plaintiff's litigation efforts on behalf of those claimants with whom he has fee agreements were designed to, and did, obtain the allocation, and disbursement, to all the members of the putative claimant class.

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1331 and Section 209 through 211 of the Economic Stabilization Amendments of 1971, Pub. L. 92-210, 85 Stat. 743 (1971) ("ESA") as incorporated in the Emergency Petroleum and Allocation Act ("EPAA"),Pub. L. 93-259,87 Stat. 627(1973).

3. Venue is properly placed in this District pursuant to 28 U.S.C. 1391.

B. PARTIES

4. Plaintiff Philip P. Kalodner is an attorney with offices at 208 Righters Mill Road, Gladwyne PA 19035, and is duly

3

licensed to practice in the Commonwealth of Pennsylvania and the District of Columbia, and is admitted to practice before numerous Federal District and Circuit Courts, including this Court, the Courts of Appeals for the District of Columbia Circuit and the Federal Circuit, and the Supreme Court of the United States. For more than eighteen years he has represented a number of major United States electric utilities and paper manufacturers and major international shipping companies in administrative and judicial litigation involving refunds sought and obtained by the U.S. Department of Energy from producers and resellers of crude oil on the basis of alleged violations by such producers and resellers of price and allocation regulations in effect from August 1973 through January 1981.

5. Defendant Samuel Bodman is the Secretary of Energy of the United States, and in that capacity is charged with the administration of the ESA, EPAA, and the Petroleum Overcharge Distribution and Restitution Act of 1986, ("PODRA"), 15 U.S.C. Sec. 4501 et seq.

6. Defendant George Breznay is the Director of the Office of Hearings and Appeals of the United States Department of Energy ("OHA" and "DOE").

7. The other named defendants are claimants for crude oil refunds obtained by the U.S. Department of Energy ("DOE") from producers and resellers of crude oil on the basis of alleged

violations of the crude oil price regulations in effect during
the regulatory, period, August 1973 through January 1981. In each
case their claims have been approved by the DOE as to a specific
number of gallons of purchase of refined petroleum products, and
they have in each case (i) prior to December 31, 2004 received
distributions of $1600 per million gallons of qualifying
purchases, and (ii) pursuant to a declaratory judgment by this
Court obtained by plaintiff as counsel for 10 of the claimants
and issued May 9, 2003 in <u>Consolidated Edison Company of New York</u>
<u>et al v. Spencer Abraham, Secretary of Energy, et al</u>, Civil
Action 01-0548 (RMC) (D.D.C.) ("<u>Con Ed IV</u>"), and as a result of
two subsequent actions brought by plaintiff on behalf of his
client claimants, <u>Consolidated Edison Co. v. Bodman</u>, No. 03-
1991RMC (D.D.C.) ("<u>Con Ed V</u>") and <u>Consolidated Edison Co. v.</u>
<u>Bodman</u>, No. 05-0816RMC (D.D.C.) ("<u>Con Ed VI</u>") they, and more than
27,000 similarly situated crude oil refund claimants have
received 90% of an amount of $772 per million gallons, i.e. $695
per million gallons; in each case the DOE has withheld 10% of
each claimant's allocated share, i.e. approximately $77 per
million gallons for payment to plaintiff Kalodner as a common
fund fee, in the event, and to the extent to which, plaintiff in
this action is awarded a common fund fee on such $772 per million
gallons.

C. CLASS ACTION ALLEGATIONS

8. Defendants, other than defendants Bodman and Breznay are sued as representatives of all crude oil refund claimants who are entitled to and  either already have received, or will in the near future receive, a pro rata portion of the approximately $284 million to be distributed by the DOE pursuant to the declaratory judgment issued in Con Ed IV and implemented by virtue of Con Ed V and Con Ed VI, other than the claimants with whom plaintiff has fee agreements and as to whom plaintiff has executed waivers of any common fund fee. Plaintiff properly maintains a class action under Rule 23 of the Federal Rules of Civil Procedure.

9. The requirements of Rule 23(a) are all met:

(a) The class of those who have benefitted and will benefit from the services rendered by plaintiff in obtaining a declaration requiring the distribution to them of some $284 million, and who have already benefitted from prior services of plaintiff in the crude oil refund proceedings, is so numerous that joinder as defendants of all members is impractical. The class consists already of 27,000 members who have received $695 per million gallons in the current distribution, and when the distribution is complete will consist of some 30,800 members.

(b) The members of the defendant class share common questions of fact and law, including most importantly (i) whether they have been benefitted by the services of plaintiff,(ii)

whether a common fund fee is therefore appropriately charged them by plaintiff for such services, and (iii) the appropriate percentage of their respective distribution which is properly paid to plaintiff as a fee.

c) The defenses of the representative parties are typical of the defenses of the defendant class.

(d) The representative defendants will fairly and adequately represent the members of the class. They are typical claimants, reflecting the varying nature of the claimants-- i.e. government purchasers of oil products, manufacturers, utilities, transporters and non-profits. Their prospective recoveries are among the larger recoveries and they are accordingly positioned to bear the burden of representing the class initially, pending certification of the class and the fixing of a reasonable fee for their services from the common fund.  They were defendants in a prior action seeking a common fund fee for plaintiff's services in Con Ed IV brought at a time when the funds now distributed and being distributed remained in the U.S. Treasury and in which they asserted that such fact precluded the award of a common fund fee to plaintiff. Kalodner v. Public Service Electric & Gas Company et al ("Public Service"), No. 04-0152HHK(D.D.C.). There is every reason to believe they will retain competent counsel.

10. Class certification is proper under all three specified categories in Rule 23 (b):

7

(1) The prosecution of separate actions against individual members of the class would create the risk of (A) inconsistent or varying adjudications with respect to individual members of the defendant class which would establish incompatible standards of conduct for plaintiff, i.e. the percentage of distribution to be recovered as fee, and (B) adjudications with respect to individual members of the class would as a practical matter substantially impair or impede the ability of other members of the class to protect their interest in defending against or minimizing the percentage fee to be paid by them.

(2) The plaintiff has acted on grounds generally applicable to the class, i.e. by rendering service equally valuable to each member of the class, thereby making appropriate final injunctive or declaratory relief with respect to the fee obligation of the defendant class as a whole.

(3) Questions of law and fact common to the members of the class as described above and throughout the Complaint predominate over any questions affecting only individual members of the defendant class, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

D. THE LEGAL BASIS FOR THE PLAINTIFF'S CLAIM

11. With regard both to Both Count I seeking a common fund fee from funds held for such potential purpose by defendants

Bodnay and Breznay, and Count II seeking a common fund fee from

funds allocated to claimants, as explained in <u>Swedish Hospital</u>

<u>Corp. V. Shalala</u>, 1F. 3d 1261, 1265 (D.C. Cir. 1993), "(T)he

'common fund' doctrine...typically applied in class

actions...allows a party who <u>creates, preserves or increases</u> the

value of a fund in which others have an ownership interest to be

reimbursed from that fund for litigation expenses, including

counsel fees " (emphasis supplied). See <u>Boeing Co. V. Van Gemert</u>,

444 U.S. 472, 478 (1980): "a litigant or a lawyer who recovers a

common fund for the benefit of persons other than himself or his

client is entitled to a reasonable attorney's fee from the fund

as a whole." The lack of formal class certification is

irrelevant, <u>Sprague v. Teconic Bank</u>, 307 U.S. 161, 166 (1939):

"(T)hat the party...neither purported to sue for a class nor

formally established by litigation a fund available to the class,

does not seem to be a differentiating factor so far as it affects

the source of the recognized power of equity to grant

reimbursement..." Finally, to the extent to which the fee here

sought for obtaining the declaratory judgment making available

$284 million to the claimant class is further supported by )i)

prior services rendered to the claimant class in judicial and

administrative proceedings in creating and increasing the fund of

which the $284 million is only a part,  compensation is

appropriate for prior phases of the proceeding in which

compensation is sought, and (ii) to the extent to which efforts in administrative and judicial proceedings were rendered in effectuating the declaratory judgment obtained in <u>Con Ed IV</u>, compensation is appropriate for efforts in such proceedings. <u>Bebchick v. Metropolitan Area Transit</u>, 895 F. 2d 396 (D.C. Cir. 1986).

12. With regard specifically to Count I, not only can a common fund fee be sought from funds while in the U.S. Treasury, <u>Swedish Hospital Corp. v. Shalala</u>, <u>supra</u>, <u>Commonwealth of Puerto Rico v. Heckler</u>, 745 F. 2d 709, but a common fund can also be sought for success in litigation against the United States after the funds have been distributed by the United States and an obligation can be imposed upon the United States to recover common fund fees from funds either due to or already distributed to claimants, <u>National Treasury Employees Union v. Nixon</u>, 521 F. 2d 317 (D.C. Cir. 1975): in the instant situation, to the extent that an awarded fee does not exceed 10% of the distribution allocated to claimants, it can be obtained by the DOE from the funds withheld from distribution precisely for the purpose of paying a common fund fee if awarded this plaintiff.

13. With regard to both Counts, the right of a lawyer to seek a common fund fee in an action brought by him, recognized in the above quoted language from <u>Boeing Co. v. Van Gemert</u>, <u>supra</u>, was established by the Supreme Court more than a hundred years

ago in <u>Central Railroad & Banking Co. v. Pettus</u>, 113 U.S. 116

(1985) and has been regularly recognized since. See, e.g. <u>Knight</u>

<u>v. U.S.</u>, 982 F. 2d 1573, 1580 (Fed. Cir. 1993),<u>Vincent v. Hughes</u>

<u>Air West</u>, 557 F. 2d 759, 769-770 (9th Cir. 1977), <u>Lindy Brothers</u>

<u>Builders Inc. of Phila. v. American Radiator and Stand. Sanitary</u>

<u>Corp.</u>, 487 F. 2d 161 (3d Cir. 1973)

D. <u>THE BACKGROUND</u>

14. In a Settlement Agreement in <u>In re The Department of</u>

<u>Energy Stripper Well Exemption Litigation</u> ("Stripper Well"), 653

F. Supp. 108 (D.Kan. 1986), the DOE agreed that (i) it would

reserve 20% of amounts recovered by it pursuant to ESA Section

209 on the basis of alleged overcharges in the pricing of crude

oil by producers and resellers during the August 1973 to January

1981 period of crude oil price controls for possible award to

claimants purchasing refined petroleum products during such

regulatory period, dividing the remaining 80% between the federal

government (40%) and the States and Territories of the United

States (40%), and (ii) that it would adopt an appropriate formula

to determine the amount which each claimant of funds from the 20%

reserve would be entitled to receive; any amounts remaining in

the 20% reserve after fully implementing such formula would be

divided equally between the United States Treasury and the

States. The formula which DOE subsequently adopted entitled each

claimant purchasing refined petroleum products during the 1973 to

1981 period to receive a percentage of (i) the sum of all recoveries by the DOE (i.e. of 100% of the recoveries) and of the amount distributed in the Stripper Well Settlement Agreement to those other than refiners, resellers and retailers equal to a percentage represented by a fraction in which the numerator was the claimant's purchases of refined petroleum product during the period and the denominator was the total gallons of refined petroleum product purchased by all end users of such products during the same regulatory period.

15. Although DOE and all of the parties in Stripper Well believed at the time of the execution of the Settlement Agreement and for some time thereafter that applications by claimants would require far less than the 20% reserved and that part of the 20% reserve would be available for distribution to the U.S. Treasury and the States, in fact (i) more than 100,000 claimants applied for crude oil refunds, and (ii) making payment to all claimants found qualified by DOE in accordance with the DOE formula would require substantially more than 20% of the funds. Accordingly, the amount available for each claimant as calculated by DOE in the current and the most recent prior distribution reflected a reduction of the claimant's pro rata share pursuant to the DOE formula to the extent to which the amount required to fund the formula for all qualified claimants exceeded the 20% reserved for such purpose.

16. DOE determined that rather than await all recoveries and
the processing of all claimant applications, it would distribute
the funds as available to the claimants found qualified by it.
Accordingly, DOE first distributed $800 per million gallons to
approved claimants and then a supplemental $800 per million
gallons (distributing to claimants approved only after the
determination to distribute the second $800 per million gallons
the amount of $1600 per million gallons).

17. Following distribution of $1600 per million gallons to
all claimants, substantial funds remained in the U.S. Treasury
accounts in which the DOE had placed the 20% reserved for
approved claimants. The funds remaining in the Treasury reserve
accrued interest and by the time DOE began their distribution in
January 2006, exceeded $284 million.

18. Because claimants represented by plaintiff Kalodner, a
group of less than 50, principally utility companies, paper
manufacturers and shipping companies were entitled by virtue of
the volume of their purchases to some more than 15% of the
amounts to which all 100,000 claimants would be entitled, such
being by far the largest group (by purchase volume) of claimants
represented by one attorney, plaintiff, for more than 18 years
following the Stripper Well Settlement Agreement has devoted his
entire professional life to representing the interest of his
clients, and almost invariably in so doing, the interest of all

approved claimants. For the past more than 15 years Kalodner has
been the only active attorney seeking to protect the interests of
the claimants by appropriate litigation.

19. After demanding unsuccessfully for several years that
the DOE commit itself to distribute the remaining reserved funds
to the approved claimants, Kalodner initiated and conducted in
the name of nine of his clients, six utilities and three paper
manufacturers ("Utilities and Manufacturers"), litigation to
force the distribution of the remaining funds to all qualified
claimants. (The six utilities represented by Kalodner are
entitled to approximately 12 and ½ % of the funds distributed to
all claimants, and are required by DOE policy to distribute all
recovered funds to tens of millions of customers, principally in
California and New York). Although, as will be subsequently
noted, Kalodner in administrative and judicial litigation has to
a significant extent increased the amounts available to all
claimants, it is primarily and principally on the basis of three
suits brought successfully to force the distribution of the
remaining $284 million to claimants that he here seeks a common
fund fee.

E. THE HISTORY OF THE LITIGATION FORMING THE PRIMARY BASIS OF
PLAINTIFF'S CLAIM FOR A COMMON FUND FEE. AND OF KALODNER'S
APPLICATION FOR A COMMON FUND FEE IN SUCH LITIGATION

20. In the first action, Consolidated Edison Co. et al v.

14

Abraham, ("Con Ed IV"), No. 01-00548 (RMC) (D.D.C.), 271 F. Supp. 2d 104 (D.D.C. 2003), Utilities and Manufacturers sought an order requiring DOE to distribute to approved claimants the funds remaining in the U.S. Treasury accounts in which the DOE had placed the 20% reserved funds. DOE opposed any such order and contended that it retained the right to determine whether or not to distribute the funds to then more than 50,000 claimants who the DOE had found were qualified to receive refunds and to whom it had previously awarded funds from the same escrow accounts (the balance of the originally approved claimants had failed to take required action to maintain their eligibility, practically io all cases because of the small amount to which they were entitled).

21. Judge Rosemary Collyer (i) rejected the contention of DOE that it had the right to determine whether to distribute the remaining funds to claimants, and (ii) granted the Utilities and Manufacturers relief in the form of a declaratory judgment declaring that "Plaintiffs and other successful claimants are entitled to a distribution of the entire 20%... (in U.S. Treasury escrow) insofar as practicable." The Court, taking cognizance that there were a few "paltry remaining claims" which remained for DOE determination and the volume of which would affect the distribution formula, concluded that "it is unable either to issue a writ of mandamus ordering the DOE to complete

distribution of those funds or to declare that further delay in making the final distribution is unjustified."

22.   Plaintiff here, Philip P. Kalodner, who had been the attorney for the Utilities and Manufacturers in obtaining the declaratory judgment moved for the award to him of a common fund fee to be charged to all claimants who would receive a distribution of the Treasury funds pursuant to the declaratory order.

23. The Court denied a common fund fee in an order issued December 4, 2003: "Because the funds at issue currently reside in the United States Treasury, and Mr. Kalodner offers no statutory exception to the doctrine of sovereign immunity, the motion for the award of a common fund fee is DENIED." Judge Collyer declined to rule on the appropriateness of a common fund fee, finding such unnecessary in view of her ruling that sovereign immunity blocked such application. The Court of Appeals for the Federal Circuit affirmed, without opinion.

24. In the second action, <u>Consolidated Edison Co. v. Bodman</u>, No. 03-1991RMC (D.D.C.), brought when 20 weeks after the issuance of the declaratory order DOE had neither acted to implement it or even publicly committed itself to do so, Utilities and Manufacturers sought issuance of a writ of mandamus compelling implementation of the declaratory order and the specific inclusion of more than $9 million which the DOE was holding in a

separate escrow account from those which had presumably been the subject of the declaratory order in <u>Con Ed IV</u>. Forty eight days later, just 12 days before its response to the Complaint was due, DOE, acting by its adjudicatory body, the Office of Hearings and Appeals ("OHA") published in the Federal Register a Notice of Proposed Procedures for Distribution of Remaining Crude Oil Overcharge Refunds and Opportunity fo Comment ("Proposed Order"), 68 Fed. Reg. 64098 (November 12, 2004). In that Notice, DOE proposed a per gallon distribution amount of $670 per million gallons as a final distribution to claimants. In calculating the per gallon amount (sometimes referred to by DOE, and here, as the "volumetric") which it proposed as a final distribution, DOE (i) failed to include in the funds to be distributed the more than $9 million in the separate escrow account, (ii) assumed that all potentially eligible claimants would indeed provide the required verification of their status, even though it knew such would not be the case, and (iii) did not propose that interest earned in the U.S. Treasury accounts following the date of determination of the $670 volumetric would be added to the amount distributed. Had DOE made its Proposed Order final, the amount being currently distributed would be $245 million rather than the $284 million now being distributed.

25. Because DOE had not committed itself to making the distribution in its Proposed Order, retaining the right to decide

otherwise in its anticipated final order, and because the DOE

proposed distribution of $670 per million gallons would not

implement the declaratory order in Con Ed IV to distribute the

remaining funds "insofar as practicable", Utilities and

Manufacturers on January 16, 2004 moved for summary judgment in

Con Ed V, seeking issuance of a writ of mandamus requiring

distribution, and the employment of a different methodology for

calculating the per gallon or volumetric amount of the

distribution; the principal elements of the proposed methodology

would (i) include in the funds to be distributed the $9.5 million

in the separate escrow account, and (ii) defer calculation of the

volumetric until the completion of the verification process, with

the result that the numerator would include interest earned in

the interim, and the denominator would be limited to the purchase

gallons as to which verification was in fact provided. (Utilities

and Manufacturers, acting by their attorney Kalodner, made the

same proposed methodology changes in Comments submitted to OHA,

as did another commenter to whom Kalodner had communicated his

concerns and his proposals with regard to the inclusion of the

$9.5 million and a different calculation methodology; the other

commenter reiterated Kalodner's proposed changes without

attribution to Kalodner as their source.)

26. Although DOE had set a January 12, 2004 deadline for

receiving Comments on its Proposed Order, as of April 1, 2004,

the date on which oral argument was held on the merits of
Utilities and Manufacturers' Motion for Summary Judgment, DOE had
issued no final order responding to the Comments it had received.
It did so on May 13, 2005, but only after Judge Collyer had
expressed concern at the April 1 oral argument hearing about
DOE's delay and had expressed sympathy with the change in
methodology proposed by Kalodner. Notice of Final Procedures for
Distribution of Remaining Crude Oil Overcharge Refunds ("First
Final Order"), 69 Fed. Reg. 29300. In that First Final Order,
OHA, acting for DOE (i) committed DOE to a final distribution
beginning February 1, 2005, after a verification period which
would end December 31, 2004, and (ii) established a formula for
the calculation of each claimant's entitlement from the funds
held in Treasury escrow, adopting in so doing the principal
elements of the methodology proposed by Kalodner on behalf of his
clients, including the distribution to claimants of the $9.5
million in the separate escrow account, and deferring calculation
of the volumetric until after the completion of the verification
period.

In the First Final Order, OHA had calculated that even if
all eligible claimants completed verification, the amount per
gallon of the distribution (the "volumetric") would be increased
from the $670 per million gallons which it had proposed to $720
per million gallons. In the Motion for Summary Judgment, Kalodner

had estimated that, using the methodology he proposed, and which

OHA adopted, the volumetric would be between $750 and $800 per

million gallons.

The volumetric which OHA has allocated to each claimant is

approximately $772.65 per million gallons ( as can be calculated

from OHA's Notice captioned "Final Procedures for Distribution of

Remaining Crude Oil Refunds" ("Second Final Order") published

January 13, 2006 at 71 Federal Register 2195 et seq.). DOE is

currently distributing approximately 90% of that amount, $695 per

million gallons (or as OHA describes it, $.000695389 per gallon),

holding 10% of the available funds per gallon, approximately $77

per million gallons,  for possible payment of the 10% common fund

fee sought by Kalodner.

27. Upon the publication of the First Final Order, Judge

Collyer was advised by Kalodner that DOE had agreed both (i) to

make a full distribution of the $275 million then in escrow (now,

with additional interest, more than $284 million), and (ii) to

accept and implement Kalodner's proposed methodology for doing

so. Plaintiffs sought a final order from the Court confirming

DOE's concessions, and the DOE moved to dismiss. The Court

granted the DOE motion on the basis that "Because the plaintiffs

no longer have a real argument with the DOE's handling of the

distribution, this case appears to be moot."

28. Following dismissal of the Complaint as moot because,