and on the basis that, DOE had in response to the Complaint and
Motion for Summary Judgment agreed to the relief sought by
plaintiffs, Kalodner moved for the award of a common fund fee
pursuant to Federal Rule of Civil Procedure 54 (d) (2).  He
sought such both (i) for obtaining a distribution, and (ii) for
its enlargement to include the entire $275 million then in
escrow, rather than only the $245 million which would have been
distributed had DOE persisted in its Proposed Order methodology.
Specifically, Kalodner sought a fee of 10% of the distribution
from the common fund to each claimant, noting that such was
substantially less than the "majority of common fund class action
fee awards (which) fall between twenty and thirty percent."
Swedish Hospital Corp. v. Shalala, 1 F. 3d 1261, 1272 (D.C. Cir.
1993).

29. In a decision issued January 26, 2005, Judge Collyer
found as a fact that in Con Ed V, Kalodner as counsel for the
Utilities and Manufacturers had both (i) obtained the creation of
a common fund for all 31,000 claimants, and (ii) increased the
proposed distribution by obtaining a change in the methodology of
calculating the volumetric:

(i) "Con Ed V insured the implementation of the Court's
declaratory judgment in Con Ed IV that DOE should disburse
approximately $275 million in funds. In responding to Con Ed V,
the DOE not only committed to a distribution but also committed

to a specific methodology for calculating the per-gallon amount of that distribution," and ( emphasis supplied), and

(ii) "The Court agrees that Mr. Kalodner <u>was successful in two adverse civil suits</u> against DOE: in <u>Con Ed IV</u>, where he obtained a declaratory order requiring the DOE to distribute some $275 million in crude oil refunds which the DOE held in U.S. Treasury, and in <u>Con Ed V</u>, when the DOE voluntarily agreed to the relief there sought,", citing the decision in <u>Koppel v. Wien</u>, 743 F. 2d 129, 135 (2nd Cir. 1984) for the holding that "Fees may be awarded even when there is no judgment on the merits or when the dispute has become moot because the relief sought is otherwise obtained." (emphasis supplied).

30. Judge Collyer found that, despite the fact that the fund had not yet been disbursed from the U.S. Treasury, the Court had "authority over the money... derived from the fact of the adversary litigation before it, through which Mr. Kalodner obtained the relief sought." Judge Collyer found appropriate precedents in decisions of the Court of Appeals for the District of Columbia Circuit for the award of a common fund fee from U.S. Treasury funds once they had been identified as a common fund to be distributed to claimants pursuant to "an undisputed and mathematically ascertainable" formula (<u>Boeing v. Van Gemert</u>, 444 U.S. 472, 478-479 (1980)), i.e. <u>Swedish Hospital Corp. v. Shalala</u>, <u>supra</u>, and <u>Commonwealth of Puerto Rico v. Heckler</u>, 745

22

F. 2d 709 (D.C. Cir. 1984),

31. Applying such precedents, Judge Collyer awarded Kalodner a common fund fee for the second benefit he had obtained for the claimants, i.e. the change in methodology from a proposed volumetric of $670 per million gallons to such volumetric as would be calculated in accordance with the methodology suggested by Kalodner after the conclusion of the process of claimant verification. The Court awarded Kalodner a fee of 30% of the extent to which the distribution to each claimant exceeds the $670 per million gallons proposed by the DOE when it agreed to make a distribution; in doing so, the Court accepted Kalodner's estimate that the result of the change in methodology would increase the volumetric to between $750 and $800 per million gallons. As noted, the actual volumetric pursuant to which distribution is being made (to the extent of 90%) is $772.65 per gallon, well within the lower half of the range assumed by the Court in making the 30% common fund fee award.

32. Although the same legal principles and applicable precedents informing the award to Kalodner of a fee for obtaining some $39.1 million of the $284.1 million calculated to be available for distribution as of December 28, 2005 are equally applicable to the first basis for the common fund fee application, i.e. the obtaining of the distribution of $245 million which DOE first proposed to distribute ($670 per million

gallons multiplied by 365,715 million gallons purchased by
verified or potentially verified claimants), Judge Collyer denied
a fee on such $245 million. Judge Collyer explained that the
Court was denying a common fund fee "as to the entire fund of
$275 million" because in the earlier Con Ed IV case the Court had
denied, on the basis of sovereign immunity, Kalodner's motion for
a common fund fee for obtaining the declaratory order there
issued, "and that decision was affirmed by the Federal Circuit.
The denial of fees for that success is now finally resolved and
cannot be relitigated.".

33. Appeals from Judge Collyer's award of a fee in part and
denial of a fee in part were taken, by the DOE, as of No. 05-5223
in the Court of Appeals for the District of Columbia Circuit, and
by Utilities and Manufacturers from the Court's denial of a fee
award, as of No. 05-5089; the two appeals were consolidated,
briefed, and orally argued January 13, 2006. In a Decision issued
April 21, 2006, the D.C. Circuit reversed the award of a common
fund fee on the $39.1 million, but remanded for a determination
of whether a fee was appropriate as to the entire $284 million.
However, the Court treated the appeal as having been from the
denial of a fee sought by the Utilities and Manufacturers, rather
than as an appeal from denial of a fee to Kalodner. Hence, there
is a serious question as to wether the remanded matter provides
the possibility of a fee to Kalodner to be provided by the DOE,

24

either from the 10% it has withheld for that purpose or from
funds which it might be required to recover from the claimants to
whom it has made 90% distribution and to whom it will distribute
the remaining 10% if it does not use such funds for a common fund
fee. It is because of that concern that this action has been
brought against defendants Bodman and Breznay.

    34. In the same April 21 Decision, the D.C. Circuit reversed
and remanded in an appeal by Kalodner of dismissal of an action
brought against 7 of the 8 claimant defendants in this action as
of No. 04-0152HHK (D.D.C.) seeking a common fund fee for
obtaining the declaratory judgment in Con Ed IV and for prior
services rendered by Kalodner to the claimant class.  (The eighth
defendant named in the prior action has not been here named
because it has not yet received disbursement of $695 per million
gallons). The remanded action had been filed prior to the success
of Kalodner in Con Ed V and therefore did not, and could not,
contain a request for assuring the full distribution achieved in
Con Ed V and for the DOE commitment there obtained to make the
distribution to claimants. In contrast, in this action, the right
to a fee is asserted against the claimant class for the
litigation success in Con Ed V and Con Ed VI as well as for the
success in Con Ed IV. Such claim is required to be asserted in
this separate action because the D.C. Circuit in remanding the
prior action appears to have precluded the District Court from

25

considering the benefits conferred on the class in Con Ed V in the remanded action.

35. The third action brought by Utilities and Manufacturers, Consolidated Edison Co. v. Bodman, No. 05-0816RMC (D.D.C.) ("Con Ed VI") was brought for the purpose of accomplishing the distribution to which DOE had agreed in Con Ed V, but which it had failed to begin February 1, 2005 as it had promised in its First Final Order. The Complaint, filed 80 days after DOE had failed to begin distribution as promised, sought a writ of mandamus requiring the DOE to make distribution of all funds which it had in the relevant U.S. Treasury reserve accounts to the extent to which they were not claimed in pending litigation.

36. The Complaint and plaintiffs' subsequently filed motion for summary judgment noted that DOE had evidently taken the position that it would not calculate the volumetric or begin distribution until all litigation which might affect its amount was concluded. It was plaintiffs' estimate that such might delay distribution two years or more, an estimate which now sees overly optimistic; as of this date, a year and a quarter beyond the promised date for starting distribution, only one of the five remaining matters which could affect the volumetric has been finally resolved, and two of them are as yet in the District Court.

37. In their Motion for Summary Judgment, filed July 1,

2006, (5 months after the DOE had promised to begin distribution)
Utilities and Manufacturers sought a writ of mandamus requiring
the DOE to distribute 89.5% of the available funds, retaining
only (i)10% being sought as a common fund fee  and (ii)
approximately .5% being claimed on a claimant's motion for
reconsideration of a rejection of a claim; as of the filing of
the motion for summary judgment, (i) the fee issue was on appeal
by both Utilities and Manufacturers and the DOE from the decision
of this Court granting a fee in part and denying it in part, and
(ii) as to the rejected claim, DOE had denied the requested
reconsideration, and an appeal to the District Court was planned
(and has since been taken). As Utilities and Manufacturers noted
in their motion papers, in the other three matters then pending
in which they were challenging awards to some 80 claimants, if
the Utilities and Manufacturers were successful, additional funds
would be available for distribution, so that their pendency did
not preclude the distribution of currently available funds.
Utilities and Manufacturers recommended in their summary judgment
papers that DOE withhold a final distribution to the
approximately 80 claimants whose awards were under challenge
until those challenges were resolved.

    38. In response to plaintiffs' motion for summary judgment,
on August 5, 2006, DOE announced that it would do as Utilities
and Manufacturers had requested, i.e. it would distribute the

27

approximately 90% of the available funds which were not the
subject of litigation. Indeed, on the basis that it would provide
the relief requested by Utilities and Manufacturers DOE asked the
Court to dismiss the Complaint.

39. Subsequently, by Federal Register Notice published
September 30, 2005, 70 Federal Register 57274, DOE did in fact
propose a distribution as urged by Utilities and Manufacturers,
(i) distributing all of the available funds save 10% retained for
possible payment of a common fund fee and the funds which would
be required if Mittal Steel USA ISG is successful in appealing
the denial of crude refunds on the basis of the operations of its
plant at Weirton, West Virginia, and (ii) withholding any
distribution to some 80 claimants whose awards were under
challenge in the courts by Utilities and Manufacturers until it
is determined whether the awards were properly made; if the
awards are vacated as Utilities and Manufacturers contend they
should be, the 80 claimants would be required to return the two
distributions already received by them as well as being precluded
from receiving the distribution currently being made and any
further distributions, and the returned funds and those which
have been set aside for the challenged claimants in the instant
distribution would be available for distribution to the other
31,000 claimants.

40. DOE had proposed calculating the distribution by

28

rounding down to the fifth decimal place in calculating the per
gallon refund. In its September 30 Notice so proposing, DOE
invited comments, requiring such to be submitted by October 31,
2005. Utilities and Manufacturers submitted Comments as did seven
others. In their Comments Utilities and Manufacturers suggested
certain necessary corrections in the Proposed Procedures
(identifying 6 additional claimants whose awards were under
challenge in pending litigation and asking they be added to the
list of those to whom this distribution would be withheld pending
conclusion of the challenge litigation, and pointing out that DOE
had not fully provided for the funds required to be withheld to
fund the award to Mittal Steel USA ISG as to its Weirton
facility. Utilities and Manufacturers also recommended that the
volumetric be rounded down to seven decimal places rather than
the five which DOE had proposed.

41. In the Notice captioned" Final Procedures for
Distribution of Remaining Crude Oil Refunds" ("Second Final
Distribution Order") dated January 6, 2006 and published January
13 at 71 Federal Register 2195, the DOE considered the Comments,
calculated the volumetric, and announced that it would begin
distribution. It amended its Proposed Procedures to adopt both
corrections suggested by Utilities and Manufacturers, adding the
six challenged claimants to the list of those to whom
distribution would be withheld, and making the necessary

29

correction to withhold an additional $975,000 which would be required to fund the Mittal Steel-Weirton claim.

42. Most importantly, the DOE accepted the Utilities and Manufacturers proposal to round the per gallon distribution down to 7 decimal places instead of the 5 it had proposed, and indeed announced it would round down to 9 decimal places. The effect of adding the two decimal places suggested by Utilities and Manufacturers is that the distribution will be increased more than $194,000; the addition by DOE of an additional two decimal increases will further increase the distribution some $3,000. To put the matter in the volumetric per million gallons (the convention used by the Court in its prior orders), the distribution volumetric which OHA would have used pursuant to its Proposed Procedures would be $690 per million gallons, the distribution pursuant to the Utilities and Manufacturers suggestion would be $695.30 per million gallons, and the volumetric which DOE determined to use for this distribution is $695.389 per million gallons.

43. DOE issued its first orders of distribution to named claimants on January 13, and in the week following, through January 20, 2006, issued distribution orders which, through that date, ordered distribution to some 26,153 claimants, more than 84% of the claimants entitled to distribution. The orders through January 20 ordered the distribution of more than $158 million,

30

withholding in each case 10% of that which would have been distributed but for the portion withheld for a possible common fund fee. Accordingly, the distribution orders deal with more than $175.5 million of the $284.1 million available, or some 62% of the available funds. Distributions orders continued to be issued, and as of April 1, 2006, distribution had been ordered as to more than 88% of the claimants to whom distribution will be made and of more than 81% of the funds to be distributed pending conclusion of the litigation for which funds are being reserved.

44. In the Second Final Distribution Order, although complying with the prayer of Utilities and Manufacturers that distribution be made immediately of the 89.5% of available funds as to which no litigation is pending, DOE refused to commit to a distribution of the 10.5% retained to the extent it is not required in connection with the litigation claims for which it is retained, i.e. the common fund fee sought by plaintiff and the award sought by Mittal Steel USA ISG for purchases at its Weirton W. Virginia facility: "In view of the uncertainties posed by the outstanding litigation, we (OHA for DOE) are not in a position to commit ourselves to any course of action until all pending litigation is resolved." 71 Fed. Reg. 2196.

45. In response to DOE's announcement that it would comply with Utilities and Manufacturers demand for distribution of 89.5% but would not commit to a distribution of the remaining amount

31

not needed to fund litigation obligations, (i) Utilities and
Manufacturers sought an order by the Court requiring DOE to
distribute to all claimants who would thereby receive a pro rata
share of $200 or more any funds currently retained by DOE for the
funding of pending litigation which are not required in
connection therewith and any funds recovered from, or not deemed
to be due to, claimants as a result of pending litigation in
which Utilities and Manufacturers are seeking such, and (ii)
Kalodner sought a common fund fee to be awarded to him for
obtaining the 89.5% distribution, such fee to constitute
compensation for all of his efforts in Con Ed IV, Con Ed V and
Con Ed VI, asserting that in each the cause of distribution was
advanced, but that it became a fact only in, and as a result of,
the Con Ed VI litigation.

46. By an Order issued March 2, 2006 in Con Ed VI, Judge
Collyer (i) dismissed the Utilities and Manufacturers Complaint
as moot, "(T)he government is now conducting the very
distribution of funds sought by Plaintiffs (Utilities and
Manufacturers)," and (ii) denied Kalodner's application for a
common fund fee on the basis that by virtue of the pending
appeals as to the fee determination she had made in Con Ed V,
"Jurisdiction over their fee claims has passed to the Court of
Appeals and those claims will be rejected here."

32

F. <u>PREVIOUS SERVICES PROVIDED BY PLAINTIFF KALODNER WHICH
PRESERVED A PORTION OF DOE-RECOVERED CRUDE OIL REFUNDS FOR THE
CLAIMANTS AND INCREASED THE AMOUNT OF CRUDE OIL REFUND CLAIMS FOR
THE CLASS</u>

47. For more than 21 years Kalodner has spent essentially
his full time in representing end user claimants to the crude oil
refunds, and in pressing their cause. For more than the last 15
of those years, Kalodner has been the sole active lawyer
representing the interest of end user claimants; throughout the
period in practically every representation of his clients, whose
combined purchases represent some 15% of the purchases by all
approved claimants, Kalodner has represented the interest of all
of the 31,000 claimants receiving the current distribution.

48. <u>Kalodner's efforts in assuring that purchasers of
refined petroleum products would receive crude oil refunds, and
in maximizing the amount of such funds</u>

(a) <u>Kalodner's successful efforts to create the right of
end users of refined products to crude oil refunds recovered by
DOE</u>

During the 1980's, while the DOE was recovering crude oil
refunds, two efforts were made which would have eliminated the
right of end user claimants to obtain those funds; in both cases,
Kalodner played a significant part in winning rejection of those
efforts, thereby assuring that there would be a fund for claimant

33

end users:

(i) Initially, three separate groups asserted their right to be the sole recipient of recovered crude oil refunds. The Refiners of the United States asserted the right to all of the recovered funds on the basis that, by virtue of the DOE Entitlements Program which spread any crude oil overcharge to one refiner to all domestic refiners, they had absorbed the entire overcharges and had not passed them on to end users in the price of refined products. On the other hand, the United States government, acting by the DOE, and the States of the United States each asserted the right to be the sole recipients of the crude oil refunds on the basis of the principle of <u>parens patriae</u>, arguing with each other as to which was the proper <u>parens patriae</u> for the purpose of award of crude oil refunds. Kalodner, acting initially on behalf of the truckers of the United States, together with the States, agricultural cooperatives, domestic airlines and utilities, in an extended proceeding satisfied OHA that the Refiners had absorbed only 2.7 to 8.1% of the overcharges, passing the balance downstream. And Kalodner and the other above named end user groups were able to obtain a settlement of then pending litigation (a)in which the Refiners' recovery was limited to a fixed amount estimated to represent 6.75% to 7.5% of the total amount to be recovered by DOE and, (b) in which the United States and the States each

34

agreed to permit end users to recover crude oil refunds, and to limit their <u>parens patriae</u> recovery to funds remaining after end user recoveries. <u>In Re The Department of Energy Stripper Well Exemption Litigation</u>, ("<u>Stripper Well</u>"), 653 F. Supp. 108 (D. Kan. 1986).

(ii) When, in accordance with its promise in the <u>Stripper Well</u> settlement, DOE adopted a policy permitting those who had not recovered in <u>Stripper Well</u> to recover crude oil refunds in DOE proceedings, the States of the United States mounted a challenge to end user claimants, asserting that such claimants, most particularly manufacturers, trans-oceanic shipping companies, non-domestic airlines, and utilities, had passed along the overcharges they had absorbed in refined product prices to their customers, and were accordingly not injured and not entitled to recover. Kalodner, together with attorneys for other shipping companies and non-domestic airlines, responded to that challenge, and satisfied OHA that, pursuant to OHA precedent, end users were entitled to a presumption of injury. Absent that presumption, end users would have been unable to prove injury and would have been denied any recovery, as is evidenced by the fact that reseller and retailer claimants without a presumption of injury have been unable to obtain crude oil refunds in the DOE proceedings.

Thus, had it not been for the efforts of Kalodner and his

35

allies in winning rejection of the Refiners', States' and United
States' attempts to obtain 100% of the refunds and the States'
efforts to make impossible any end user recovery, there would
have been no fund at all for end users. Accordingly, Kalodner was
instrumental in <u>creating</u> the common fund for end users.

(b) <u>Kalodner's efforts in increasing the funds</u>
<u>available to end user claimants</u>

(i) For more than 10 years, in the late 1980's and 1990's,
Kalodner on behalf of his clients, and Kalodner alone on behalf
of end users, intervened before OHA in numerous DOE enforcement
actions seeking crude oil refunds, for the purpose of assisting
DOE's enforcement arm in obtaining refunds and maximizing the
amount of those refunds. Among the most productive interventions
was that in a proceeding which resulted in a settlement with the
Occidental Petroleum Corporation which added $55 million to the
Treasury escrow fund for end user claimants; it is Kalodner's
view that, but for his contributions in the DOE prosecution of
Occidental, there would have been no settlement, and no $55
million for end users.

A substantial portion of Kalodner's time during a more than
10 year period was expended in assisting DOE in seeking crude oil
refunds, sometimes and indeed generally successfully, and on
occasion unsuccessfully, as in a prosecution of Chevron; in that
case, when OHA dismissed the enforcement arm's effort to obtain

36

more then a half billion dollars, Kalodner and a group of States appealed that dismissal to the courts in what turned out to be an unsuccessful effort to reverse OHA's dismissal and obtain refunds for all claimants.

(ii) During the immediately past 6 years, Kalodner, on behalf of his clients, and acting again for the benefit of all end user claimants, has challenged a number of awards made by OHA to crude oil refund claimants, asserting that the claimants were not entitled to the awards; any reduction in such awards necessarily benefits the end user claimants who are sharing in the $284 million, in that it (a) adds to the pool of funds available for approved claimants and (b) reduces the denominator number of gallons to be divided into the $284 million in calculating the per gallon refund to which claimants are entitled. One of these challenges remain pending in the courts, while in several OHA has, upon the filing of a Complaint by Kalodner, asked for remand; in one such matter, involving an award to the Ameripol Synpol Corporation, the OHA has, based upon the arguments by Kalodner, reduced a more than $1 million award by almost $500,000 by reducing the number of purchased gallons deemed qualified for refund.

In another situation, involving a claim by Hercules, Incorporated, prior to rendering a final decision as to the claim, OHA specifically invited Kalodner, and Kalodner alone, to

37

submit comments on its proposed decision. After considering
Kalodner's comments, OHA reduced its proposed award of more than
$1,000,000 by the amount of $360,000, thereby both (a) adding to
the fund pool available to approved end user claimants and (b)
reducing the total volume of gallons on the basis of which the
per gallon distribution of the remaining $284 million is being
made.

OHA's invitation to Kalodner, and to Kalodner alone, to
comment on its proposed decision in Hercules, Incorporated, is
one of a number of situations in which OHA and DOE have
recognized that Kalodner is acting on behalf of all end user
claimants, so that it need not invite other end users to
participate to assure adequate end user representation. Indeed,
in the Occidental Petroleum Corporation matter discussed above,
DOE invited Kalodner, and Kalodner alone as a representative of
the end users to participate in the mediation effort which
resulted in the settlement of the matter.

G. <u>CAUSE OF ACTION</u>

<u>COUNT I: Kalodner v. Bodman and Breznay</u>

49. The allegations of paragraphs 1 through 7 and 11
through 46 are incorporated herein by reference.

50. By virtue of three successive actions in this Court
brought on behalf of his clients, Utilities and Manufacturers,
plaintiff Kalodner has achieved the allocation of $772 per

million gallons of purchased refined petroleum product to more than 27,000 claimants, of which allocated amount DOE has distributed to such claimants 90% or $695 per million gallons, retaining 10%, or $77 per million gallons for possible payment to Kalodner as a common fund fee. In the first of those actions, Con Ed IV, Kalodner obtained a declaratory judgment that DOE was obligated to distribute the funds remaining in certain U.S. Treasury accounts to the claimants it had found qualified for crude oil refunds "insofar as practicable." By virtue of the second action, Con Ed V, Kalodner obtained (i) first, in response to the Complaint, an agreement by DOE to comply with the declaratory judgment issued in Con Ed IV, albeit a compliance which would not distribute some $39 million of the $284 million in funds available for distribution (as of the time of such distribution in early 2006), and (ii) second, by virtue of a motion for summary judgment, DOE's agreement to change its methodology for distribution which would enlarge the proposed distribution to include the entire $284 million; upon, and by virtue of DOE's agreement both to implement the declaratory judgment, and to do so to the full extent of the available funds, the Court declared the matter moot and dismissed it. By virtue of the third action, Con Ed VI, brought when DOE failed to meet its own deadline for distribution and was threatening to withhold distribution until the resolution of pending litigation which

39

would affect the per gallon amount of distribution, and particularly by virtue of a motion for summary judgment in such action, Kalodner obtained the immediate distribution of 89.5% of the amount per gallon available for distribution; as was the case in Con Ed V, the action was dismissed as moot when DOE agreed to the remedy sought in the motion for summary judgment as to the funds as to which there was no litigation challenge.

51. In addition to the actions above described which directly caused the distribution made to claimants, Kalodner rendered critically important services to the end user claimants to crude oil refunds by (i) insuring that there would be restitution of crude oil refunds to end user purchasers of refined petroleum products and  (ii) increasing the amount of such distribution both by playing a critical role in assisting the DOE in recovering the crude oil refunds, and by successfully challenging awards to claimants not justified in amount, thereby increasing the per gallon distribution to all other claimants.

52. Plaintiff Kalodner is entitled to a common fund fee in the amount withheld by DOE for possible use for such purpose, i.e. $77 per million gallons, 10% of the $772 per million gallons allocated to the claimants to whom distribution has been made to the extent of 90% of that allocation, i.e. $695 per million gallons (all of the preceding amounts have been rounded down to the nearest dollar per million gallons.) Such a fee of 10% of the

40

common fund made available to each claimant is considerably less than both the range of 20% to 30% which the Court of Appeals for the District of Columbia Circuit found to be the normal practice, and the 20% awarded, in Swedish Hospital Corp. v. Shalala, supra, 1 F. 3d at 1272, Moreover, a 10% fee is consistent with common fund fees agreed to by DOE itself in two prior matters in which it agreed to such fees to be paid from funds recovered by it and to be awarded to end user claimants, even though in those cases there had been no formal class certification. In Re The Department of Energy Stripper Well Exemption Litigation, 653 F. Supp. 108 (D. Kan. 1986), and Amoco Oil Company et al, C.A. H-94-2423 D.C. Southern Dist. Texas (1955).

53. Defendants Bodman and Breznay, having withheld 10%, or $77 per million gallons, from the amount distributed to the claimants to whom distribution has been made of $695 per million gallons for possible award to Kalodner as a common fund fee should be ordered to distribute such withheld amount to Kalodner for such purpose.

COUNT I: Kalodner v. Public Service Electric & Gas Co., Eastman Chemical Company, General Motors Corporation, General Council on Finance and Administration of the United Methodist Church, Seagroup Inc., Zim Israel Navigation Co. Ltd. and City of New York

In the alternative to the relief requested in Count I:

54. The allegations of paragraphs 1 through 52 are incorporated herein by reference.

55. Upon the setting by the Court of an appropriate percentage as a common fund fee, the interests of judicial efficiency require that the Court direct that the class representative defendants, acting on behalf of each of the members of the class to whom a 90% distribution has been made, direct the DOE to pay such awarded fee to plaintiff Kalodner to the extent to which such is available within the 10% reserved for such purpose in the distribution to each such claimant.

56. Should the Court decline to direct the class representatives as requested in paragraph 55, or should DOE refuse to disburse the funds in accordance with such direction, the Court should enter judgment against each member of the class to whom 90% distribution has been made in the amount of each claimant's pro rata share of the common fund fee.

WHEREFORE, plaintiff prays for Orders of this Court as follows:

(a) An Order certifying the defendant class and the defendants other than Bodman and Breznay as representatives of the class;

(b) An Order awarding to plaintiff Philip P. Kalodner a common fund fee in the amount of 10% of the allocation made by

42

DOE to each member of the claimant class to whom a 90% distribution of such allocated amount has been made, i.e. a common fund fee in the amount of $77 per million gallons;

c) An Order directing defendants Bodman and Breznay to pay such amounts as awarded pursuant to (b) to plaintiff Philip P. Kalodner;

d) In the alternative, should the Court deny the relief prayed for in c), an Order directing the defendants on behalf of each of the class members to direct the DOE to distribute to plaintiff Kalodner as a common fund fee the 10% withheld in the distribution to each member of the class to whom a 90% distribution has been made;

(e) In the further alternative, should the Court deny the relief requested in c) and d), an Order that each member of the class to whom distribution has been made pay to plaintiff Kalodner a common fund fee in an amount of 10% of the amount allocated to each such class member, i.e. a common fund fee of $77 per million gallons;

(f) Awarding the plaintiff his costs; and

(g) Granting such other and further relief as may be just and proper.

43

Respectfully submitted,

Philip P. Kalodner
208 Righters Mill Road
Gladwyne PA 19035
DC Bar 973578

May 2, 2006                    Pro Se