IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PHILIP P. KALODNER
208 Righters Mill Road
Gladwyne, PA 19035

     Plaintiff

      V.

                                    CIVIL ACTION NO.

SAMUEL BODMAN
Secretary of Energy, United States    No. 1:06-cv-00818(RMC)
1000 Independence Ave. S.W.
Washington DC 20585

GEORGE B. BREZNAY
Director, Office of Hearings and Appeals
U.S. Department of Energy
1000 Independence Avenue S.W.
Washington DC 20585

AND

PUBLIC SERVICE ELECTRIC & GAS CO.
80 Park Plaza
Newark, NJ 07102-4109

EASTMAN CHEMICAL COMPANY
100 N. Eastman Road
Kingsport, TN 37660-5265

                                   CLASS ACTION

GENERAL MOTORS CORPORATION
2000 Renaissance Center Box 300
Detroit, MI 48265-3000

SEAGROUP, INC.
2187 Atlantic St.
Stamford, CT 06902-6880

1

GENERAL COUNCIL ON FINANCE AND
ADMINISTRATION OF THE UNITED
METHODIST CHURCH
1200 Davis Street
Evanston, IL 60201-4193

CITY OF NEW YORK
100 Church St.
New York, NY 10007

ZIM ISRAEL NAVIGATION CO. LTD
5801 Lakewright Drive
Norfolk, VA 23502-1862

FLORIDA POWER CORPORATION
100 Central Ave.
Saint Petersburg, FL 33701-3324

        Defendants

_____

## FIRST AMENDED COMPLAINT

A. NATURE OF ACTION, JURISDICTION AND VENUE

1. This is an action for a common fund fee sought by
plaintiff, an attorney, from funds which have been (i) allocated
by the U.S. Department of Energy ("DOE") to each of more than
29,300 claimants in the DOE crude oil refund proceedings, and
(ii) 90% of which funds allocated to each claimant have been
disbursed to each such claimant, with (iii) the remaining 10%
allocated to each such claimant withheld by the DOE for possible
payment to plaintiff Philip P. Kalodner ("Kalodner") as a common
fund fee.

        In Count I of the Complaint, as to which the defendants are
the Secretary of Energy and the Director of the Office of

2

Hearings and Appeals, plaintiff seeks as a common fund fee to be paid him the 10% withheld by the DOE in the disbursement to each claimant to whom disbursement (of 90%) has been made other than those claimants with whom plaintiff has fee agreements and as to whom plaintiff has waived any right to a common fund fee. In Count II of the Complaint, as to which the defendants are claimants who have received a 90% distribution and who are sued as representatives of all claimants who have received distribution of the 90% (other than those claimants with whom plaintiff has fee agreements), plaintiff seeks, in the alternative to recovery from the DOE, recovery of the same 10% fee from the claimants to whom disbursement of 90% has been made and to whom an additional 10% has been allocated, or alternatively 10% of the amount which has been or will be distributed to each claimant.

The principal basis of the request for a common fund fee is that plaintiff's litigation efforts on behalf of those claimants with whom he has fee agreements were designed to, and did, obtain the allocation, and disbursement, to all the members of the putative claimant class.

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1331 and Section 209 through 211 of the Economic Stabilization Amendments of 1971, Pub. L. 92-210, 85 Stat. 743 (1971) ("ESA") as incorporated in the Emergency Petroleum and

Allocation Act ("EPAA"),Pub. L. 93-259,87 Stat. 627(1973).

3. Venue is properly placed in this District pursuant to 28 U.S.C. 1391.

B. <u>PARTIES</u>

4. Plaintiff Philip P. Kalodner is an attorney with offices at 208 Righters Mill Road, Gladwyne PA 19035, and is duly licensed to practice in the Commonwealth of Pennsylvania and the District of Columbia, and is admitted to practice before numerous Federal District and Circuit Courts, including this Court, the Courts of Appeals for the District of Columbia Circuit and the Federal Circuit, and the Supreme Court of the United States. For more than eighteen years he has represented a number of major United States electric utilities and paper manufacturers and major international shipping companies in administrative and judicial litigation involving refunds sought and obtained by the U.S. Department of Energy from producers and resellers of crude oil on the basis of alleged violations by such producers and resellers of price and allocation regulations in effect from August 1973 through January 1981.

5. Defendant Samuel Bodman is the Secretary of Energy of the United States, and in that capacity is charged with the administration of the ESA, EPAA, and the Petroleum Overcharge Distribution and Restitution Act of 1986, ("PODRA"), 15 U.S.C. Sec. 4501 et seq.

6. Defendant George Breznay is the Director of the Office of Hearings and Appeals of the United States Department of Energy ("OHA" and "DOE").

7. The other named defendants are claimants for crude oil refunds obtained by the U.S. Department of Energy ("DOE") from producers and resellers of crude oil on the basis of alleged violations of the crude oil price regulations in effect during the regulatory, period, August 1973 through January 1981. In each case their claims have been approved by the DOE as to a specific number of gallons of purchase of refined petroleum products, and they have in each case (i) prior to December 31, 2004 received distributions of $1600 per million gallons of qualifying purchases, and (ii) pursuant to a declaratory judgment by this Court obtained by plaintiff as counsel for 10 of the claimants and issued May 9, 2003 in <u>Consolidated Edison Company of New York et al v. Spencer Abraham, Secretary of Energy, et al</u>, Civil Action 01-0548 (RMC) (D.D.C.) ("<u>Con Ed IV</u>"), and as a result of two subsequent actions brought by plaintiff on behalf of his client claimants, <u>Consolidated Edison Co. v. Bodman</u>, No. 03-1991RMC (D.D.C.) ("<u>Con Ed V</u>") and <u>Consolidated Edison Co. v. Bodman</u>, No. 05-0816RMC (D.D.C.) ("<u>Con Ed VI</u>") they, and more than 29,300 similarly situated crude oil refund claimants have received 90% of an amount of $772 per million gallons, i.e. $695 per million gallons; in each case the DOE has withheld 10% of

each claimant's allocated share, i.e. approximately $77 per
million gallons, for payment to plaintiff Kalodner as a common
fund fee, in the event, and to the extent to which, plaintiff in
this action is awarded a common fund fee on such $772 per million
gallons.

C. <u>CLASS ACTION ALLEGATIONS</u>

8. Defendants, other than defendants Bodman and Breznay are
sued as representatives of all crude oil refund claimants who are
entitled to and  either already have received, or will in the
near future receive, a pro rata portion of the approximately $284
million to be distributed by the DOE pursuant to the declaratory
judgment issued in <u>Con Ed IV</u> and implemented by virtue of <u>Con Ed
V</u> and <u>Con Ed VI</u>, other than the claimants with whom plaintiff has
fee agreements and as to whom plaintiff has executed waivers of
any common fund fee. Plaintiff properly maintains a class action
under Rule 23 of the Federal Rules of Civil Procedure.

9. The requirements of Rule 23(a) are all met:

(a) The class of those who have benefitted and will
benefit from the services rendered by plaintiff in obtaining a
declaration requiring the distribution to them of some $284
million, and who have already benefitted from prior services of
plaintiff in the crude oil refund proceedings, is so numerous
that joinder as defendants of all members is impractical. The

6

class consists already of more than 29,300 members who have
received $695 per million gallons in the current distribution,
and when the distribution is complete will consist of some 30,800
members.

(b) The members of the defendant class share common
questions of fact and law, including most importantly (i) whether
they have been benefitted by the services of plaintiff,(ii)
whether a common fund fee is therefore appropriately charged them
by plaintiff for such services, and (iii) the appropriate
percentage of their respective distribution which is properly
paid to plaintiff as a fee.

c) The defenses of the representative parties are typical of
the defenses of the defendant class.

(d) The representative defendants will fairly and adequately
represent the members of the class. They are typical claimants,
reflecting the varying nature of the claimants-- i.e. government
purchasers of oil products, manufacturers, utilities,
transporters and non-profits. Their prospective recoveries are
among the larger recoveries and they are accordingly positioned
to bear the burden of representing the class initially, pending
certification of the class and the fixing of a reasonable fee for
their services from the common fund.  They were defendants in a
prior action seeking a common fund fee for plaintiff's services
in <u>Con Ed IV</u> brought at a time when the funds now distributed and

7

being distributed remained in the U.S. Treasury and in which they asserted that such fact precluded the award of a common fund fee to plaintiff. <u>Kalodner v. Public Service Electric & Gas Company et al</u> ("<u>Public Service</u>"), No. 04-0152HHK(D.D.C.). There is every reason to believe they will retain competent counsel.

10. Class certification is proper under all three specified categories in Rule 23 (b):

(1) The prosecution of separate actions against individual members of the class would create the risk of (A) inconsistent or varying adjudications with respect to individual members of the defendant class which would establish incompatible standards of conduct for plaintiff, i.e. the percentage of distribution to be recovered as fee, and (B) adjudications with respect to individual members of the class would as a practical matter substantially impair or impede the ability of other members of the class to protect their interest in defending against or minimizing the percentage fee to be paid by them.

(2) The plaintiff has acted on grounds generally applicable to the class, i.e. by rendering service equally valuable to each member of the class, thereby making appropriate final injunctive or declaratory relief with respect to the fee obligation of the defendant class as a whole.

(3) Questions of law and fact common to the members of the class as described above and throughout the Complaint predominate

8

over any questions affecting only individual members of the
defendant class, and a class action is superior to other
available methods for the fair and efficient adjudication of the
controversy.

    D. <u>THE LEGAL BASIS FOR THE PLAINTIFF'S CLAIM</u>

    11. With regard both to Both Count I seeking a common fund
fee from funds held for such potential purpose by defendants
Bodnay and Breznay, and Count II seeking a common fund fee from
funds allocated and/or distributed to claimants, as explained in
<u>Swedish Hospital Corp. V. Shalala</u>, 1F. 3d 1261, 1265 (D.C. Cir.
1993), "(T)he 'common fund' doctrine...typically applied in class
actions...allows a party who <u>creates, preserves or increases</u> the
value of a fund in which others have an ownership interest to be
reimbursed from that fund for litigation expenses, including
counsel fees " (emphasis supplied). See <u>Boeing Co. V. Van Gemert</u>,
444 U.S. 472, 478 (1980): "a litigant or a lawyer who recovers a
common fund for the benefit of persons other than himself or his
client is entitled to a reasonable attorney's fee from the fund
as a whole." The lack of formal class certification is
irrelevant, <u>Sprague v. Teconic Bank</u>, 307 U.S. 161, 166 (1939):
"(T)hat the party...neither purported to sue for a class nor
formally established by litigation a fund available to the class,
does not seem to be a differentiating factor so far as it affects
the source of the recognized power of equity to grant

reimbursement..." Finally, to the extent to which the fee here
sought for obtaining the declaratory judgment making available
$284 million to the claimant class is further supported by )i)
prior services rendered to the claimant class in judicial and
administrative proceedings in creating and increasing the fund of
which the $284 million is only a part, compensation is
appropriate for prior phases of the proceeding in which
compensation is sought, and (ii) to the extent to which efforts
in administrative and judicial proceedings were rendered in
effectuating the declaratory judgment obtained in Con Ed IV,
compensation is appropriate for efforts in such proceedings.
Bebchick v. Metropolitan Area Transit, 895 F. 2d 396 (D.C. Cir.
1986).

    12. With regard specifically to Count I, not only can a
common fund fee be sought from funds while in the U.S. Treasury,
Swedish Hospital Corp. v. Shalala, supra, Commonwealth of Puerto
Rico v. Heckler, 745 F. 2d 709 (D.C. Cir. 1984), but a common
fund can also be sought for success in litigation against the
United States after the funds have been distributed by the United
States, and an obligation can be imposed upon the United States
to recover common fund fees from funds either due to, or already
distributed to, claimants, National Treasury Employees Union v.
Nixon, 521 F. 2d 317 (D.C. Cir. 1975): in the instant situation,
to the extent that an awarded fee does not exceed 10% of the

10

distribution allocated to claimants, it can be obtained by the DOE from the funds withheld from distribution precisely for the purpose of paying a common fund fee if awarded this plaintiff.

13. With regard to both Counts, the right of a lawyer to seek a common fund fee in an action brought by him, recognized in the above quoted language from Boeing Co. v. Van Gemert, supra, was established by the Supreme Court more than a hundred years ago in Central Railroad & Banking Co. v. Pettus, 113 U.S. 116 (1985) and has been regularly recognized since. See, e.g. Knight v. U.S., 982 F. 2d 1573, 1580 (Fed. Cir. 1993),Vincent v. Hughes Air West, 557 F. 2d 759, 769-770 (9th Cir. 1977), Lindy Brothers Builders Inc. of Phila. v. American Radiator and Stand. Sanitary Corp., 487 F. 2d 161 (3d Cir. 1973)

D. THE BACKGROUND

14. In a Settlement Agreement in In re The Department of Energy Stripper Well Exemption Litigation ("Stripper Well"), 653 F. Supp. 108 (D.Kan. 1986), the DOE agreed that (i) it would reserve 20% of amounts recovered by it pursuant to ESA Section 209 on the basis of alleged overcharges in the pricing of crude oil by producers and resellers during the August 1973 to January 1981 period of crude oil price controls for possible award to claimants purchasing refined petroleum products during such regulatory period, dividing the remaining 80% between the federal government (40%) and the States and Territories of the United

States (40%), and (ii) that it would adopt an appropriate formula to determine the amount which each claimant of funds from the 20% reserve would be entitled to receive; any amounts remaining in the 20% reserve after fully implementing such formula would be divided equally between the United States Treasury and the States. The formula which DOE subsequently adopted entitled each claimant purchasing refined petroleum products during the 1973 to 1981 period to receive a percentage of (i) the sum of all recoveries by the DOE (i.e. of 100% of the recoveries) and of the amount distributed in the Stripper Well Settlement Agreement to those other than refiners, resellers and retailers equal to a percentage represented by a fraction in which the numerator was the claimant's purchases of refined petroleum product during the regulatory period and the denominator was the total gallons of refined petroleum product purchased by all end users of such products during the same regulatory period.

15. Although DOE and all of the parties in Stripper Well believed at the time of the execution of the Settlement Agreement and for some time thereafter that applications by claimants would require far less than the 20% reserved and that part of the 20% reserve would be available for distribution to the U.S. Treasury and the States, in fact (i) more than 100,000 claimants applied for crude oil refunds, and (ii) making payment to all claimants found qualified by DOE in accordance with the DOE formula would

12

require substantially more than 20% of the funds. Accordingly,
the amount available for each claimant as calculated by DOE in
the current and the most recent prior distribution reflected a
reduction of the claimant's pro rata share pursuant to the DOE
formula to the extent to which the amount required to fund the
formula for all qualified claimants exceeded the 20% reserved for
such purpose.

16. DOE determined that rather than await all recoveries and
the processing of all claimant applications, it would distribute
the funds as available to the claimants found qualified by it.
Accordingly, DOE first distributed $800 per million gallons to
approved claimants and then a supplemental $800 per million
gallons (distributing $1600 per million gallons to claimants
approved only after the determination to distribute the second
$800 per million gallons).

17. Following distribution of $1600 per million gallons to
all claimants, substantial funds remained in the U.S. Treasury
accounts in which the DOE had placed the 20% reserved for
approved claimants. The funds remaining in the Treasury reserve
accrued interest and by the time DOE began their distribution in
January 2006, exceeded $284 million.

18. Because claimants represented by plaintiff Kalodner, a
group of less than 50, principally utility companies, paper
manufacturers and shipping companies, were entitled by virtue of

the volume of their purchases to some more than 15% of the amounts to which all 100,000 claimants would be entitled, such being by far the largest group (by purchase volume) of claimants represented by one attorney, plaintiff, for more than 18 years following the <u>Stripper Well</u> Settlement Agreement has devoted his entire professional life to representing the interest of his clients, and almost invariably in so doing, the interest of all approved claimants. For the past more than 15 years Kalodner has been the only active attorney seeking to protect the interests of the claimants by appropriate litigation.

19. After demanding unsuccessfully for several years that the DOE commit itself to distribute the remaining reserved funds to the approved claimants, Kalodner initiated and conducted in the name of nine of his clients, six utilities and three paper manufacturers ("Utilities and Manufacturers"), litigation to force the distribution of the remaining funds to all qualified claimants. (The six utilities represented by Kalodner are entitled to approximately 12 and ½ % of the funds distributed to all claimants, and are required by DOE policy to distribute all recovered funds to tens of millions of customers, principally in California and New York). Although, as will be subsequently noted, Kalodner in administrative and judicial litigation has to a significant extent increased the amounts available to all claimants, it is primarily and principally on the basis of three

14

suits brought successfully to force the distribution of the
remaining $284 million to claimants that he here seeks a common
fund fee.

E. THE HISTORY OF THE LITIGATION FORMING THE PRIMARY BASIS OF
PLAINTIFF'S CLAIM FOR A COMMON FUND FEE. AND OF KALODNER'S
APPLICATION FOR A COMMON FUND FEE IN SUCH LITIGATION

   20. In the first action, Consolidated Edison Co. et al v.
Abraham, ("Con Ed IV"), No. 01-00548 (RMC) (D.D.C.), 271 F. Supp.
2d 104 (D.D.C. 2003), Utilities and Manufacturers sought an order
requiring DOE to distribute to approved claimants the funds
remaining in the U.S. Treasury accounts in which the DOE had
placed the 20% reserved funds. DOE opposed any such order and
contended that it retained the right to determine whether or not
to distribute the funds to then more than 50,000 claimants who
the DOE had found were qualified to receive refunds and to whom
it had previously awarded funds from the same escrow accounts
(the balance of the originally approved claimants had failed to
take required action to maintain their eligibility, practically
io all cases because of the small amount to which they were
entitled).

   21. Judge Rosemary Collyer (i) rejected the contention of
DOE that it had the right to determine whether to distribute the
remaining funds to claimants, and (ii) granted the Utilities and
Manufacturers relief in the form of a declaratory judgment,

15

declaring that "Plaintiffs and other successful claimants are entitled to a distribution of the entire 20%... (in U.S. Treasury escrow) insofar as practicable." The Court, taking cognizance that there were a few "paltry remaining claims" which remained for DOE determination and the volume of which would affect the distribution formula, concluded that "it is unable either to issue a writ of mandamus ordering the DOE to complete distribution of those funds or to declare that further delay in making the final distribution is unjustified."

22. Plaintiff here, Philip P. Kalodner, who had been the attorney for the Utilities and Manufacturers in obtaining the declaratory judgment moved for the award to him of a common fund fee to be charged to all claimants who would receive a distribution of the Treasury funds pursuant to the declaratory order.

23. The Court denied a common fund fee in an order issued December 4, 2003: "Because the funds at issue currently reside in the United States Treasury, and Mr. Kalodner offers no statutory exception to the doctrine of sovereign immunity, the motion for the award of a common fund fee is DENIED." Judge Collyer declined to rule on the appropriateness of a common fund fee, finding such unnecessary in view of her ruling that sovereign immunity blocked such application. The Court of Appeals for the Federal Circuit affirmed, without opinion.

24. In the second action, <u>Consolidated Edison Co. v. Bodman</u>,
No. 03-1991RMC (D.D.C.), brought when 20 weeks after the issuance
of the declaratory order DOE had neither acted to implement it or
even publicly committed itself to do so, Utilities and
Manufacturers sought issuance of a writ of mandamus compelling
implementation of the declaratory order and the specific
inclusion of more than $9 million which the DOE was holding in a
separate escrow account from those which had presumably been the
subject of the declaratory order in <u>Con Ed IV</u>. Forty eight days
later, just 12 days before its response to the Complaint was due,
DOE, acting by its adjudicatory body, the Office of Hearings and
Appeals ("OHA") published in the Federal Register a Notice of
Proposed Procedures for Distribution of Remaining Crude Oil
Overcharge Refunds and Opportunity for Comment ("Proposed
Order"), 68 Fed. Reg. 64098 (November 12, 2004). In that Notice,
DOE  proposed a per gallon distribution amount of $670 per
million gallons as a final distribution to claimants. In
calculating the per gallon amount (sometimes referred to by DOE,
and here, as the "volumetric") which it proposed as a final
distribution, DOE (i) failed to include in the funds to be
distributed the more than $9 million in the separate escrow
account, (ii) assumed that all potentially eligible claimants
would indeed provide the required verification of their status,
even though it knew such would not be the case, and (iii) did not

17

propose that interest earned in the U.S. Treasury accounts following the date of determination of the $670 volumetric would be added to the amount distributed. Had DOE made its Proposed Order final, the amount being currently distributed would be $245 million rather than the $284 million now being distributed.

25. Because DOE had not committed itself to making the distribution in its Proposed Order, retaining the right to decide otherwise in its anticipated final order, and because the DOE proposed distribution of $670 per million gallons would not implement the declaratory order in Con Ed IV to distribute the remaining funds "insofar as practicable", Utilities and Manufacturers on January 16, 2004 moved for summary judgment in Con Ed V, seeking issuance of a writ of mandamus requiring distribution, and the employment of a different methodology for calculating the per gallon or volumetric amount of the distribution; the principal elements of the proposed methodology would (i) include in the funds to be distributed the $9.5 million in the separate escrow account, and (ii) defer calculation of the volumetric until the completion of the verification process, with the result that the numerator would include interest earned in the interim, and the denominator would be limited to the purchase gallons as to which verification was in fact provided. (Utilities and Manufacturers, acting by their attorney Kalodner, made the same proposed methodology changes in Comments submitted to OHA,

18

as did another commenter to whom Kalodner had communicated his
concerns and his proposals with regard to the inclusion of the
$9.5 million and a different calculation methodology; the other
commenter reiterated Kalodner's proposed changes without
attribution to Kalodner as their source.)

26. Although DOE had set a January 12, 2004 deadline for
receiving Comments on its Proposed Order, as of April 1, 2004,
the date on which oral argument was held on the merits of
Utilities and Manufacturers' Motion for Summary Judgment, DOE had
issued no final order responding to the Comments it had received.
It did so on May 13, 2005, but only after Judge Collyer had
expressed concern at the April 1 oral argument hearing about
DOE's delay and had expressed sympathy with the change in
methodology proposed by Kalodner. Notice of Final Procedures for
Distribution of Remaining Crude Oil Overcharge Refunds ("First
Final Order"), 69 Fed. Reg. 29300. In that First Final Order,
OHA, acting for DOE (i) committed DOE to a final distribution
beginning February 1, 2005, after a verification period which
would end December 31, 2004, and (ii) established a formula for
the calculation of each claimant's entitlement from the funds
held in Treasury escrow, adopting in so doing the principal
elements of the methodology proposed by Kalodner on behalf of his
clients, including the distribution to claimants of the $9.5
million in the separate escrow account, and deferring calculation

of the volumetric until after the completion of the verification period.

In the First Final Order, OHA had calculated that even if all eligible claimants completed verification, the amount per gallon of the distribution (the "volumetric") would be increased from the $670 per million gallons which it had proposed to $720 per million gallons. In the Motion for Summary Judgment, Kalodner had estimated that, using the methodology he proposed, and which OHA adopted, the volumetric would be between $750 and $800 per million gallons.

The volumetric which OHA has allocated to each claimant is approximately $772.65 per million gallons ( as can be calculated from OHA's Notice captioned "Final Procedures for Distribution of Remaining Crude Oil Refunds" ("Second Final Order") published January 13, 2006 at 71 Federal Register 2195 et seq.). DOE is currently distributing approximately 90% of that amount, $695.389 per million gallons (or as OHA describes it, $.000695389 per gallon), holding 10% of the available funds per gallon, approximately $77 per million gallons,  for possible payment of the 10% common fund fee sought by Kalodner.

27. Upon the publication of the First Final Order, Judge Collyer was advised by Kalodner that DOE had agreed both (i) to make a full distribution of the $275 million then in escrow (as of December 28, 2005, with additional interest, more than $284

20

million), and (ii) to accept and implement Kalodner's proposed methodology for doing so. Plaintiffs sought a final order from the Court confirming DOE's concessions, and the DOE moved to dismiss. The Court granted the DOE motion on the basis that "Because the plaintiffs no longer have a real argument with the DOE's handling of the distribution, this case appears to be moot."

28. Following dismissal of the Complaint as moot because, and on the basis that, DOE had in response to the Complaint and Motion for Summary Judgment agreed to the relief sought by plaintiffs, Kalodner moved for the award of a common fund fee pursuant to Federal Rule of Civil Procedure 54 (d) (2). He sought such both (i) for obtaining a distribution, and (ii) for its enlargement to include the entire $275 million then in escrow, rather than only the $245 million which would have been distributed had DOE persisted in its Proposed Order methodology. Specifically, Kalodner sought a fee of 10% of the distribution from the common fund to each claimant, noting that such was substantially less than the "majority of common fund class action fee awards (which) fall between twenty and thirty percent." Swedish Hospital Corp. v. Shalala, 1 F. 3d 1261, 1272 (D.C. Cir. 1993).

29. In a decision issued January 26, 2005, Judge Collyer found as a fact that in Con Ed V, Kalodner as counsel for the

21

Utilities and Manufacturers had both (i) obtained the creation of a common fund for all 31,000 claimants, and (ii) increased the proposed distribution by obtaining a change in the methodology of calculating the volumetric:

(i) "Con Ed V insured the implementation of the Court's declaratory judgment in Con Ed IV that DOE should disburse approximately $275 million in funds. In responding to Con Ed V, the DOE not only committed to a distribution but also committed to a specific methodology for calculating the per-gallon amount of that distribution," (emphasis supplied), and

(ii) "The Court agrees that Mr. Kalodner was successful in two adverse civil suits against DOE: in Con Ed IV, where he obtained a declaratory order requiring the DOE to distribute some $275 million in crude oil refunds which the DOE held in U.S. Treasury, and in Con Ed V, when the DOE voluntarily agreed to the relief there sought,", citing the decision in Koppel v. Wien, 743 F. 2d 129, 135 (2nd Cir. 1984) for the holding that "Fees may be awarded even when there is no judgment on the merits or when the dispute has become moot because the relief sought is otherwise obtained." (emphasis supplied).

30. Judge Collyer found that, despite the fact that the fund had not yet been disbursed from the U.S. Treasury, the Court had "authority over the money... derived from the fact of the adversary litigation before it, through which Mr. Kalodner

obtained the relief sought." Judge Collyer found appropriate precedents in decisions of the Court of Appeals for the District of Columbia Circuit for the award of a common fund fee from U.S. Treasury funds once they had been identified as a common fund to be distributed to claimants pursuant to "an undisputed and mathematically ascertainable" formula (Boeing v. Van Gemert, 444 U.S. 472, 478-479 (1980)), i.e. Swedish Hospital Corp. v. Shalala, supra, and Commonwealth of Puerto Rico v. Heckler, 745 F. 2d 709 (D.C. Cir. 1984),

31. Applying such precedents, Judge Collyer awarded Kalodner a common fund fee for the second benefit he had obtained for the claimants, i.e. the change in methodology from a proposed volumetric of $670 per million gallons to such volumetric as would be calculated in accordance with the methodology suggested by Kalodner after the conclusion of the process of claimant verification. The Court awarded Kalodner a fee of 30% of the extent to which the distribution to each claimant exceeds the $670 per million gallons proposed by the DOE when it agreed to make a distribution; in doing so, the Court accepted Kalodner's estimate that the result of the change in methodology would increase the volumetric to between $750 and $800 per million gallons. As noted, the actual volumetric pursuant to which distribution is being made (to the extent of 90%) is $772.65 per gallon, well within the lower half of the range assumed by the

23

Court in making the 30% common fund fee award.

32. Although the same legal principles and applicable precedents informing the award to Kalodner of a fee for obtaining some $39.1 million of the $284.1 million calculated to be available for distribution as of December 28, 2005 are equally applicable to the first basis for the common fund fee application, i.e. the obtaining of the distribution of $245 million which DOE first proposed to distribute ($670 per million gallons multiplied by 365,715 million gallons purchased by verified or potentially verified claimants), Judge Collyer denied a fee on such $245 million. Judge Collyer explained that the Court was denying a common fund fee "as to the entire fund of $275 million" because in the earlier Con Ed IV case the Court had denied, on the basis of sovereign immunity, Kalodner's motion for a common fund fee for obtaining the declaratory order there issued, "and that decision was affirmed by the Federal Circuit. The denial of fees for that success is now finally resolved and cannot be relitigated.".

33. Appeals from Judge Collyer's award of a fee in part and denial of a fee in part were taken, by the DOE, as of No. 05-5223 in the Court of Appeals for the District of Columbia Circuit, and by Utilities and Manufacturers from the Court's denial of a fee award, as of No. 05-5089; the two appeals were consolidated, briefed, and orally argued January 13, 2006. In a Decision issued

April 21, 2006, the D.C. Circuit reversed the award of a common fund fee on the $39.1 million, but remanded for a determination of whether a fee was appropriate as to the entire $284 million. However, the Court treated the appeal as having been from the denial of a fee sought by the Utilities and Manufacturers, rather than as an appeal from denial of a fee to Kalodner. Hence, there is a serious question as to wether the remanded matter provides the possibility of a fee to Kalodner to be provided by the DOE, either from the 10% it has withheld for that purpose or from funds which it might be required to recover from the claimants to whom it has made 90% distribution and to whom it will distribute the remaining 10% if it does not use such funds for a common fund fee. It is because of that concern that this action has been brought against defendants Bodman and Breznay.

34. In the same April 21 Decision, the D.C. Circuit reversed and remanded in an appeal by Kalodner of dismissal of an action brought against the 8 claimant defendants in this action as of No. 04-0152HHK (D.D.C.) seeking a common fund fee for obtaining the declaratory judgment in Con Ed IV and for prior services rendered by Kalodner to the claimant class. The remanded action had been filed prior to the success of Kalodner in Con Ed V and therefore did not, and could not, contain a request for assuring the full distribution achieved in Con Ed V and for the DOE commitment there obtained to make the distribution to claimants.

In contrast, in this action, the right to a fee is asserted against the claimant class for the litigation success in Con Ed V and Con Ed VI as well as for the success in Con Ed IV. Such claim is required to be asserted in this separate action because the D.C. Circuit in remanding the prior action appears to have precluded the District Court from considering the benefits conferred on the class in Con Ed V in the remanded action.

35. The third action brought by Utilities and Manufacturers, Consolidated Edison Co. v. Bodman, No. 05-0816RMC (D.D.C.) ("Con Ed VI") was brought for the purpose of accomplishing the distribution to which DOE had agreed in Con Ed V, but which it had failed to begin February 1, 2005 as it had promised in its First Final Order. The Complaint, filed 80 days after DOE had failed to begin distribution as promised, sought a writ of mandamus requiring the DOE to make distribution of all funds which it had in the relevant U.S. Treasury reserve accounts to the extent to which they were not claimed in pending litigation.

36. The Complaint and plaintiffs' subsequently filed motion for summary judgment noted that DOE had evidently taken the position that it would not calculate the volumetric or begin distribution until all litigation which might affect its amount was concluded. It was plaintiffs' estimate that such might delay distribution two years or more, an estimate which now sees overly optimistic; as of this date, more than a year and a half beyond

the promised date for starting distribution, although several of
the remaining matters which could affect the volumetric have been
finally resolved, the issue of whether, or to what extent, the
10% withheld by DOE for a possible common fund fee to Kalodner
should be awarded to him is in the District Court.

37. In their Motion for Summary Judgment, filed July 1,
2006, (5 months after the DOE had promised to begin distribution)
Utilities and Manufacturers sought a writ of mandamus requiring
the DOE to distribute 89.5% of the available funds, retaining
only (i)10% being sought as a common fund fee  and (ii)
approximately .5% being claimed on a claimant's motion for
reconsideration of a rejection of a claim; as of the filing of
the motion for summary judgment, (i) the fee issue was on appeal
by both Utilities and Manufacturers and the DOE from the decision
of this Court granting a fee in part and denying it in part, and
(ii) as to the rejected claim, DOE had denied the requested
reconsideration, and an appeal to the District Court was planned
(and has since been taken; the District Court affirmed the denial
by OHA of reconsideration, and an appeal from that decision is
pending in the Court of Appeals for the District of Columbia
Circuit, as of No. 06-5227).

38. In response to plaintiffs' motion for summary judgment,
on August 5, 2006, DOE announced that it would do as Utilities
and Manufacturers had requested, i.e. it would distribute the

approximately 90% of the available funds which were not the subject of litigation. Indeed, on the basis that it would provide the relief requested by Utilities and Manufacturers DOE asked the Court to dismiss the Complaint.

39. Subsequently, by Federal Register Notice published September 30, 2005, 70 Federal Register 57274, DOE did in fact propose a distribution as urged by Utilities and Manufacturers, (i) distributing all of the available funds save 10% retained for possible payment of a common fund fee and the funds which would be required if Mittal Steel USA ISG is successful in appealing the denial of crude refunds on the basis of the operations of its plant at Weirton, West Virginia, and (ii) withholding any distribution to some 80 claimants whose awards were under challenge in the courts by Utilities and Manufacturers until it was determined whether the awards were properly made; those challenges to awards made by DOE have been denied in judicial proceedings and a 90% distribution has been made to all from whom distribution was withheld.

40. DOE had proposed calculating the distribution by rounding down to the fifth decimal place in calculating the per gallon refund. In its September 30 Notice so proposing, DOE invited comments, requiring such to be submitted by October 31, 2005. Utilities and Manufacturers submitted Comments as did seven others. In their Comments Utilities and Manufacturers suggested

certain necessary corrections in the Proposed Procedures--
identifying 6 additional claimants whose awards were under
challenge in pending litigation and asking they be added to the
list of those to whom this distribution would be withheld pending
conclusion of the challenge litigation, and pointing out that DOE
had not fully provided for the funds required to be withheld to
fund the award to Mittal Steel USA ISG as to its Weirton
facility. Utilities and Manufacturers also recommended that the
volumetric be rounded down to seven decimal places rather than
the five which DOE had proposed.

41. In the Notice captioned" Final Procedures for
Distribution of Remaining Crude Oil Refunds" ("Second Final
Distribution Order") dated January 6, 2006 and published January
13 at 71 Federal Register 2195, the DOE considered the Comments,
calculated the volumetric, and announced that it would begin
distribution. It amended its Proposed Procedures to adopt both
corrections suggested by Utilities and Manufacturers, adding the
six challenged claimants to the list of those to whom
distribution would be withheld, and making the necessary
correction to withhold an additional $975,000 which would be
required to fund the Mittal Steel-Weirton claim.

42. Most importantly, the DOE accepted the Utilities and
Manufacturers proposal to round the per gallon distribution down
to 7 decimal places instead of the 5 it had proposed, and indeed

announced it would round down to 9 decimal places. The effect of
adding the two decimal places suggested by Utilities and
Manufacturers is that the distribution will be increased more
than $194,000; the addition by DOE of an additional two decimal
increases will further increase the distribution some $3,000. To
put the matter in the volumetric per million gallons (the
convention used by the Court in its prior orders), the
distribution volumetric which OHA would have used pursuant to its
Proposed Procedures would be $690 per million gallons, the
distribution pursuant to the Utilities and Manufacturers
suggestion would be $695.30 per million gallons, and the
volumetric which DOE determined to use for this distribution is
$695.389 per million gallons.

43. DOE issued its first orders of distribution to named
claimants on January 13, and in the week following, through
January 20, 2006, issued distribution orders which, through that
date, ordered distribution to some 26,153 claimants, more than
84% of the claimants entitled to distribution. The orders through
January 20 ordered the distribution of more than $158 million,
withholding in each case 10% of that which would have been
distributed but for the portion withheld for a possible common
fund fee. Accordingly, the distribution orders dealt with more
than $175.5 million of the $284.1 million available, or some 62%
of the available funds. Distributions orders continued to be

issued, and as of September 7, 2006, distribution had been ordered as to more than 95% of the claimants to whom distribution will be made and of more than 93% of the funds to be distributed.

44. In the Second Final Distribution Order, although complying with the prayer of Utilities and Manufacturers that distribution be made immediately of the 89.5% of available funds as to which no litigation is pending, DOE refused to commit to a distribution of the 10.5% retained to the extent it is not required in connection with the litigation claims for which it is retained, i.e. the common fund fee sought by plaintiff and the award sought by Mittal Steel USA ISG for purchases at its Weirton W. Virginia facility: "In view of the uncertainties posed by the outstanding litigation, we (OHA for DOE) are not in a position to commit ourselves to any course of action until all pending litigation is resolved." 71 Fed. Reg. 2196.

45. In response to DOE's announcement that it would comply with Utilities and Manufacturers demand for distribution of 89.5% but would not commit to a distribution of the remaining amount not needed to fund litigation obligations, (i) Utilities and Manufacturers sought an order by the Court requiring DOE to distribute to all claimants who would thereby receive a pro rata share of $200 or more any funds currently retained by DOE for the funding of pending litigation which are not required in connection therewith and any funds recovered from, or not deemed

31

to be due to, claimants as a result of then pending (now resolved) litigation in which Utilities and Manufacturers were seeking such, and (ii) Kalodner sought a common fund fee to be awarded to him for obtaining the 89.5% distribution, such fee to constitute compensation for all of his efforts in Con Ed IV, Con Ed V and Con Ed VI, asserting that in each the cause of distribution was advanced, but that it became a fact only in, and as a result of, the Con Ed VI litigation.

46. By an Order issued March 2, 2006 in Con Ed VI, Judge Collyer (i) dismissed the Utilities and Manufacturers Complaint as moot, "(T)he government is now conducting the very distribution of funds sought by Plaintiffs (Utilities and Manufacturers)," and (ii) denied Kalodner's application for a common fund fee on the basis that by virtue of the then pending appeals as to the fee determination she had made in Con Ed V, "Jurisdiction over their fee claims has passed to the Court of Appeals and those claims will be rejected here." An appeal from such order was taken to the Court of Appeals for the District of Columbia Circuit, as of 06-5101, and the DOE's motion for summary affirmance granted by that Court.

F. PREVIOUS SERVICES PROVIDED BY PLAINTIFF KALODNER WHICH PRESERVED A PORTION OF DOE-RECOVERED CRUDE OIL REFUNDS FOR THE CLAIMANTS AND INCREASED THE AMOUNT OF CRUDE OIL REFUND CLAIMS FOR THE CLASS

47. For more than 21 years Kalodner has spent essentially his full time in representing end user claimants to the crude oil refunds, and in pressing their cause. For more than the last 15 of those years, Kalodner has been the sole active lawyer representing the interest of end user claimants; throughout the period in practically every representation of his clients, whose combined purchases represent some 15% of the purchases by all approved claimants, Kalodner has represented the interest of all of the 31,000 claimants receiving the current distribution.

48. Kalodner's efforts in assuring that purchasers of refined petroleum products would receive crude oil refunds, and in maximizing the amount of such funds

(a) Kalodner's successful efforts to create the right of end users of refined products to crude oil refunds recovered by DOE

During the 1980's, while the DOE was recovering crude oil refunds, two efforts were made which would have eliminated the right of end user claimants to obtain those funds; in both cases, Kalodner played a significant part in winning rejection of those efforts, thereby assuring that there would be a fund for claimant end users:

(i) Initially, three separate groups asserted their right to be the sole recipient of recovered crude oil refunds. The Refiners of the United States asserted the right to all of

33

the recovered funds on the basis that, by virtue of the DOE
Entitlements Program which spread any crude oil overcharge to one
refiner to all domestic refiners, they had absorbed the entire
overcharges and had not passed them on to end users in the price
of refined products. On the other hand, the United States
government, acting by the DOE, and the States of the United
States each asserted the right to be the sole recipients of the
crude oil refunds on the basis of the principle of parens
patriae, arguing with each other as to which was the proper
parens patriae for the purpose of award of crude oil refunds.
Kalodner, acting initially on behalf of the truckers of the
United States, together with the States, agricultural
cooperatives, domestic airlines and utilities, in an extended
proceeding satisfied OHA that the Refiners had absorbed only 2.7
to 8.1% of the overcharges, passing the balance downstream. And
Kalodner and the other above named end user groups were able to
obtain a settlement of then pending litigation (a)in which the
Refiners' recovery was limited to a fixed amount estimated to
represent 6.75% to 7.5% of the total amount to be recovered by
DOE and, (b) in which the United States and the States each
agreed to permit end users to recover crude oil refunds, and to
limit their parens patriae recovery to funds remaining after end
user recoveries. In Re The Department of Energy Stripper Well
Exemption Litigation, ("Stripper Well"), 653 F. Supp. 108 (D.

Kan. 1986).

(ii) When, in accordance with its promise in the <u>Stripper Well</u> settlement, DOE adopted a policy permitting those who had not recovered in <u>Stripper Well</u> to recover crude oil refunds in DOE proceedings, the States of the United States mounted a challenge to end user claimants, asserting that such claimants, most particularly manufacturers, trans-oceanic shipping companies, non-domestic airlines, and utilities, had passed along the overcharges they had absorbed in refined product prices to their customers, and were accordingly not injured and not entitled to recover. Kalodner, together with attorneys for other shipping companies and non-domestic airlines, responded to that challenge, and satisfied OHA that, pursuant to OHA precedent, end users were entitled to a presumption of injury. Absent that presumption, end users would have been unable to prove injury and would have been denied any recovery, as is evidenced by the fact that reseller and retailer claimants without a presumption of injury have been unable to obtain crude oil refunds in the DOE proceedings.

Thus, had it not been for the efforts of Kalodner and his allies in winning rejection of the Refiners', States' and United States' attempts to obtain 100% of the refunds and the States' efforts to make impossible any end user recovery, there would have been no fund at all for end users. Accordingly, Kalodner was

instrumental in <u>creating</u> the common fund for end users.

(b) <u>Kalodner's efforts in increasing the funds</u>
<u>available to end user claimants</u>

(i) For more than 10 years, in the late 1980's and 1990's,
Kalodner on behalf of his clients, and Kalodner alone on behalf
of end users, intervened before OHA in numerous DOE enforcement
actions seeking crude oil refunds, for the purpose of assisting
DOE's enforcement arm in obtaining refunds and maximizing the
amount of those refunds. Among the most productive interventions
was that in a proceeding which resulted in a settlement with the
Occidental Petroleum Corporation which added $55 million to the
Treasury escrow fund for end user claimants; it is Kalodner's
view that, but for his contributions in the DOE prosecution of
Occidental, there would have been no settlement, and no $55
million for end users.

A substantial portion of Kalodner's time during a more than
10 year period was expended in assisting DOE in seeking crude oil
refunds, sometimes and indeed generally successfully, and on
occasion unsuccessfully, as in a prosecution of Chevron; in that
case, when OHA dismissed the enforcement arm's effort to obtain
more then a half billion dollars, Kalodner and a group of States
appealed that dismissal to the courts in what turned out to be an
unsuccessful effort to reverse OHA's dismissal and obtain refunds
for all claimants.

(ii) During the immediately past 6 years, Kalodner, on behalf of his clients, and acting again for the benefit of all end user claimants, has challenged a number of awards made by OHA to crude oil refund claimants, asserting that the claimants were not entitled to the awards; any reduction in such awards necessarily benefits the end user claimants who are sharing in the $284 million, in that it (a) adds to the pool of funds available for approved claimants and (b) reduces the denominator number of gallons to be divided into the $284 million in calculating the per gallon refund to which claimants are entitled. In the case of several of those challenges, upon the filing of a Complaint by Kalodner, DOE asked for remand; in one such matter, involving an award to the Ameripol Synpol Corporation, the OHA has, based upon the arguments by Kalodner, reduced a more than $1 million award by almost $500,000 by reducing the number of purchased gallons deemed qualified for refund.

In another situation, involving a claim by Hercules, Incorporated, prior to rendering a final decision as to the claim, OHA specifically invited Kalodner, and Kalodner alone, to submit comments on its proposed decision. After considering Kalodner's comments, OHA reduced its proposed award of more than $1,000,000 by the amount of $360,000, thereby both (a) adding to the fund pool available to approved end user claimants and (b)

reducing the total volume of gallons on the basis of which the per gallon distribution of the remaining $284 million is being made.

OHA's invitation to Kalodner, and to Kalodner alone, to comment on its proposed decision in Hercules, Incorporated, is one of a number of situations in which OHA and DOE have recognized that Kalodner is acting on behalf of all end user claimants, so that it need not invite other end users to participate to assure adequate end user representation. Indeed, in the Occidental Petroleum Corporation matter discussed above, DOE invited Kalodner, and Kalodner alone as a representative of the end users to participate in the mediation effort which resulted in the settlement of the matter.

G. <u>CAUSE OF ACTION</u>

<u>COUNT I: Kalodner v. Bodman and Breznay</u>

49. The allegations of paragraphs 1 through 7 and 11 through 49 are incorporated herein by reference.

50. By virtue of three successive actions in this Court brought on behalf of his clients, Utilities and Manufacturers, plaintiff Kalodner has achieved the allocation of $772 per million gallons of purchased refined petroleum product to more than 29,000 claimants, of which allocated amount DOE has distributed to such claimants 90% or $695 per million gallons, retaining 10%, or $77 per million gallons for possible payment to

38

Kalodner as a common fund fee. In the first of those actions, Con Ed IV, Kalodner obtained a declaratory judgment that DOE was obligated to distribute the funds remaining in certain U.S. Treasury accounts to the claimants it had found qualified for crude oil refunds "insofar as practicable." By virtue of the second action, Con Ed V, Kalodner obtained (i) first, in response to the Complaint, an agreement by DOE to comply with the declaratory judgment issued in Con Ed IV, albeit a compliance which would not distribute some $39 million of the $284 million in funds available for distribution (as of the time of such distribution in early 2006), and (ii) second, by virtue of a motion for summary judgment, DOE's agreement to change its methodology for distribution which would enlarge the proposed distribution to include the entire $284 million; upon, and by virtue of DOE's agreement both to implement the declaratory judgment, and to do so to the full extent of the available funds, the Court declared the matter moot and dismissed it. By virtue of the third action, Con Ed VI, brought when DOE failed to meet its own deadline for distribution and was threatening to withhold distribution until the resolution of pending litigation which would affect the per gallon amount of distribution, and particularly by virtue of a motion for summary judgment in such action, Kalodner obtained the immediate distribution of 89.5% of the amount per gallon available for distribution; as was the case

in Con Ed V, the action was dismissed as moot when DOE agreed to the remedy sought in the motion for summary judgment as to the funds as to which there was no litigation challenge.

51. In addition to the actions above described which directly caused the distribution made to claimants, Kalodner rendered critically important services to the end user claimants to crude oil refunds by (i) insuring that there would be restitution of crude oil refunds to end user purchasers of refined petroleum products and  (ii) increasing the amount of such distribution both by playing a critical role in assisting the DOE in recovering the crude oil refunds, and by successfully challenging awards to claimants not justified in amount, thereby increasing the per gallon distribution to all other claimants.

52. Plaintiff Kalodner is entitled to a common fund fee in the amount withheld by DOE for possible use for such purpose, i.e. $77 per million gallons, 10% of the $772 per million gallons allocated to the claimants to whom distribution has been made to the extent of 90% of that allocation, i.e. $695 per million gallons (all of the preceding amounts have been rounded down to the nearest dollar per million gallons.) Such a fee of 10% of the common fund made available to each claimant is considerably less than both the range of 20% to 30% which the Court of Appeals for the District of Columbia Circuit found to be the normal practice, and the 20% awarded, in Swedish Hospital Corp. v. Shalala, supra,

1 F. 3d at 1272,  Moreover, a 10% fee is consistent with common fund fees agreed to by DOE itself in two prior matters in which it agreed to such fees to be paid from funds recovered by it and to be awarded to end user claimants, even though in those cases there had been no formal class certification. <u>In Re The Department of Energy Stripper Well Exemption Litigation</u>, 653 F. Supp. 108 (D. Kan. 1986), and <u>Amoco Oil Company et al</u>, C.A. H-94-2423 D.C. Southern Dist. Texas (1955).

53. Defendants Bodman and Breznay, having withheld 10%, or $77 per million gallons, from the amount distributed to the claimants to whom distribution has been made of $695 per million gallons for possible award to Kalodner as a common fund fee should be ordered to distribute to Kalodner such withheld amount as to each claimant from whom such 10% was withheld, except as to claimants with whom Kalodner has fee agreements and has waived any claim to a common fund fee. (Kalodner's clients have instituted suit to recover the withheld 10% as an additional distribution in lieu of his waiver of any common fund fee).

<u>COUNT II: Kalodner v. Public Service Electric & Gas Co., Eastman Chemical Company, General Motors Corporation, General Council on Finance and Administration of the United Methodist Church, Seagroup Inc., Zim Israel Navigation Co. Ltd., City of New York, and Florida Power Corporation</u>

In the alternative to the relief requested in Count I:

54. The allegations of paragraphs 1 through 52 are incorporated herein by reference.

55. Upon the setting by the Court of an appropriate percentage as a common fund fee, the interests of judicial efficiency require that the Court direct that the class representative defendants, acting on behalf of each of the members of the class to whom a 90% distribution has been made, direct the DOE to pay such awarded fee to plaintiff Kalodner to the extent to which such is available within the 10% reserved for such purpose in the distribution to each such claimant.

56. Should the Court decline to direct the class representatives as requested in paragraph 55, or should DOE refuse to disburse the funds in accordance with such direction, the Court should enter judgment against each member of the class to whom 90% distribution has been made in the amount of 10% of the distribution to each member of the class already made, or which shall hereafter be made.

WHEREFORE, plaintiff prays for Orders of this Court as follows:

(a) An Order certifying the defendant class and the defendants other than Bodman and Breznay as representatives of the class;

(b) An Order awarding to plaintiff Philip P. Kalodner a common fund fee in the amount of 10% of the allocation made by

42

DOE to each member of the claimant class to whom a 90%
distribution of such allocated amount has been made, i.e. a
common fund fee in the amount of $77 per million gallons as to
all claimants to whom distribution has been made except for those
claimants with whom Kalodner has a fee agreement and as to whom
he has waived any claim to a common fund fee, together with
appropriate interest thereon;

c) An Order directing defendants Bodman and Breznay to pay
such amounts as awarded pursuant to (b) to plaintiff Philip P.
Kalodner;

d) In the alternative, should the Court deny the relief
prayed for in c), an Order directing the defendants other than
Bodman and Breznay acting on behalf of each of the class members,
to direct the DOE to distribute to plaintiff Kalodner as a common
fund fee the 10% withheld in the distribution to each member of
the class to whom a 90% distribution has been made, together with
interest thereon;

(e) In the further alternative, should the Court deny the
relief requested in c) and d), an Order that each member of the
class to whom distribution has been made pay to plaintiff
Kalodner a common fund fee in an amount of 10% of the amount
allocated to each such class member, i.e. a common fund fee of
$77 per million gallons, together with interest thereon;

(f) Awarding the plaintiff his costs; and

43

(g) Granting such other and further relief as may be just and proper.

                              Respectfully submitted,


                              _____

                              Philip P. Kalodner
                              208 Righters Mill Road
                              Gladwyne PA 19035
                              DC Bar 973578

September 12,2006             Pro Se

44